# EXHIBIT A
## DIP Loan Agreement

## SUPERPRIORITY DEBTOR IN POSSESSION SECURED PROMISSORY NOTE

$1,749,050.00                                                          April 2, 2020

On April 2, 2020 (the "Petition Date"), RUDY'S BARBERSHOP HOLDINGS LLC, a Delaware limited liability company, (the "Borrower") and certain of its affiliates[1] (collectively, the "Debtors") commenced chapter 11 cases, which cases are being jointly administered under Chapter 11 Case No. 20-10746 (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 .S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1008 of the Bankruptcy Code. The Borrower has requested that RBS Salon Holdings, Inc., as lender (and together with its successors and permitted assigns, hereinafter referred to as "DIP Lender") to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "Note"), make loans from time to time evidenced by this Note. Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors" and together with the Borrower, the "Obligors"), and are simultaneously executing Guarantees in favor of the DIP Lender. The Borrower intends to utilize such Loans to (i) fund working capital expenses and other general corporate expenses, including to pay the costs of administration of the Chapter 11 Cases and associated United States Trustee fees and (ii) pay interest in kind, fees and expenses associated with the Loans, including the reasonable fees and expenses of the DIP Lender, in each case as authorized by the Loan Documents and subject in all respects to the Budget, subject to any Permitted Variance, as attached hereto as Exhibit 1.

This Note is dated as of April 2, 2020, by Borrower, RUDY'S BARBERSHOP HOLDINGS LLC, in favor of DIP Lender, RBS SALON HOLDINGS, INC.This Note shall be senior in right of payment to all other indebtedness of Borrower and is a direct obligation of Borrower.

1.    Commitment; Loans. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein and in the other Loan Documents, DIP Lender agrees to make (i) on the Closing Date (defined below), a Loan to the Borrower in the amount of $715,000.00 (the "Interim Loans") and (ii) on the Final Funding Date (defined below), a Loan to the Borrower in the aggregate principal amount not to exceed $1,749,050.00 (the "Final Loans"). Effective upon the occurrence of the Closing Date, without any further action by any party to this Note, the Bankruptcy Court or any other Person, the Prepetition Note Obligations owing to the DIP Lender on the Closing Date shall be refinanced into and constitute Loans hereunder and the outstanding principal balance of and interest and fees accrued under the Prepetition Note and all other amounts in respect thereof owing to the DIP Lender shall constitute a portion of the outstanding amount of the Loans hereunder and shall be due and payable in accordance with the terms set forth herein applicable to all Loans.

---

[1]    The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are (i) Rudy's Barbershop Holdings, LLC (xxxx); (ii) Rudy's Barber Shop, LLC (xxxx); (iii) Rudy's Portland, LLC (xxxx); (iv) Rudy's Southeast, LLC (xxxx); (v) Rudy's Hollywood, LLC (xxxx); and (vi) Rudy's New York, LLC (xxxx). The Debtors' headquarters are located at 1605 Boylston Ave, Suite 202, Seattle, WA 98122.

2.    Payment of Principal.

a)    FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Borrower hereby unconditionally promises to pay to DIP Lender, in the manner hereinafter provided, the principal sum of one million, seven hundred and forty-nine thousand, and fifty and 00/100 dollars ($1,749,050.00) or as much thereof as has been or may be advanced (such advances together with the Prepetition Note Obligations being referred to herein collectively as the "Loans"), together with interest, in immediately available funds and in lawful money of the United States of America, all in accordance with the provisions hereinafter specified.

b)    Subject to the acceleration provisions set forth herein, all unpaid principal, fees and accrued and unpaid interest shall be due and payable in full on the Maturity Date.

3.    Interest; Fees.

a)    *Interest.* The unpaid principal amount of this Note shall accrue interest at a rate equal to 10.00% per annum; *provided that* upon the occurrence and during the continuation of an Event of Default, the outstanding principal amount of this Note and any accrued and unpaid interest and all other overdue amounts shall bear interest until paid at the stated rate plus 2.00% per annum.  All payments of interest upon this Note shall be paid in kind.  Interest that Borrower paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the Note.  Additional PIK Principal shall be considered principal for all purposes and, without limiting the foregoing, the Additional PIK Principal of the Note shall bear interest at the rate applicable to the Note beginning on the date such interest is paid in kind and added to the principal amount of the Note.  Accrued interest shall be added to the outstanding principal amount of the Note on the last Business Day of each month and, to the extent accrued on any principal amount being repaid or prepaid, on the date of such repayment or prepayment. All computations of interest shall be made on the basis of a 360-day year based on the actual number of days elapsed in the period during which it accrues.

b)    *Fees.* The Borrower shall pay to DIP Lender a commitment fee in an amount equal to 2.00% of the total Commitment(the "Commitment Fee"). The Commitment Fee shall be fully earned on the Closing Date and paid in kind upon consummation of the Sale. The Borrower shall pay to DIP Lender an exit premium in an amount equal to 2.00% of the total principal obligations under the Loans (the "Exit Premium"). The Exit Premium shall be earned on the Closing Date and payable on the scheduled Maturity Date; *provided, however*, that in the event the Sale closes, the Exit Premium will be waived in its entirety by the DIP Lender.

4.    Maturity Date.  Unless extended by the DIP Lender in its sole and absolute discretion, the earliest to occur of (i) May 15, 2020; (ii) the date that is twenty-five (25) days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date; (iii) the effective date of any plan of reorganization or plan of liquidation of the Obligors confirmed by the Bankruptcy Court; (iv) the earlier of (x) the 363 Sale Effective Date or (y) consummation of a sale of substantially all of the Debtors' assets; (v) the date the Bankruptcy Court (x) orders the conversion of the bankruptcy case of any Obligor to a case under Chapter 7 of the Bankruptcy Code or (y) dismisses the Chapter 11 Cases with respect to any Obligor; and (vi) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Note.

5.    Prepayments; Payment Terms.  The principal amount outstanding from time to time under this Note may be prepaid in whole or in part at any time and from time to time without premium or penalty.  Any

prepayment of principal shall be accompanied by payment of any interest accrued and unpaid through the date of such prepayment.

6. <u>Manner and Application of Payments</u>. All payments of principal of, and interest upon, this Note shall be made by the Borrower to the DIP Lender in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the DIP Lender in writing from time to time. All payments under this Note shall be made to the DIP Lender without withholding, defense, set-off, counterclaim, or deduction. Payments and prepayments made to the DIP Lender by the Borrower hereunder shall be applied first to expenses recoverable under Section 12, then accrued interest and then to principal. If the due date of any payment under this Note would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day, and interest shall be payable on any principal so extended for the period of such extension.

7. <u>Guarantee</u>. The Guarantors hereby jointly and severally guarantee to the DIP Lender and its successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Debtor Relief Laws) of the Obligations. The Guarantors hereby further jointly and severally agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Debtor Relief Laws) any of the Obligations strictly in accordance with the terms of any document or agreement evidencing any such Obligations, including in the amounts, in the currency and at the place expressly agreed to thereunder, irrespective of and without giving effect to any law, order, decree or regulation in effect from time to time of the jurisdiction where the Borrower, any Guarantor or any other person obligated on any such Obligations is located, the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal. The obligations of the Guarantors under this Section 7 are primary, absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Borrower under this Note and the other Loan Documents, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 7 that the obligations of the Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances and shall apply to any and all Obligations now existing or in the future arising. The guarantee in this Section 7 is a continuing guarantee and is a guaranty of payment and not merely of collection and shall apply to all Obligations whenever arising

8. <u>Obligors' Representation and Warranties</u>. Each of the Obligors hereby represents and warrants to DIP Lender that, (i) on the Closing Date, subject to the Bankruptcy Court's entry of the Interim Order, and (ii) on the Final Funding Date (defined below), subject to the Bankruptcy Court's entry of the Final Order:

    a) *General Representations.* It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority to execute, deliver and perform its obligations under this Note and the other Loan Documents. It has duly authorized and taken all other appropriate action for the execution, delivery and performance of this Note and any other document or instrument delivered pursuant hereto or in connection herewith and the consummation of the transactions provided for in this Note. It has duly executed and delivered each Loan Document and each Loan Document constitutes its legal, valid and binding obligation, enforceable in accordance with its terms. The execution and delivery of the Loan Documents, the performance of the transactions contemplated thereby and the fulfillment of the terms thereof will not (i) conflict with or violate any of its

organizational documents or its contractual obligations, (ii) conflict with or violate any postpetition order, judgment or decree of governmental authority binding on it, (iii) require any approval of its equity-holders or any approval or consent of any Person under any contractual obligation of such Obligor, except for such approvals or consents which will be obtained on or before the date hereof, (iv) conflict with or violate any applicable laws, or (v) result in or require the creation or imposition of any Lien upon any of its properties or assets (other than any Liens created hereunder).  Other than the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of such Obligor, threatened against or affecting any Obligor (A) that arose on or after the Petition Date and as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (B) that involve the Loan Documents or the transactions contemplated hereby. It is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.  No representation or warranty of any Obligor contained in any Loan Document or in any other documents, certificates or statements given to the DIP Lender for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to the Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements given to the DIP Lender for use in connection with the transactions contemplated hereby;

b)  *Collateral Representations*. It owns the Collateral purported to be owned by it or otherwise has rights or the power to transfer rights in the Collateral in which it purports to grant a security interest hereunder and no Lien exists upon the Collateral other than (i) the security interest created or provided for herein and (ii) Permitted Liens.

c)  *Bankruptcy Representations.*

i.  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the Interim Order, and (y) the hearing for the approval of the Interim Order was given in each case. Borrower shall give, on a timely basis as specified in the DIP Orders, all notices required to be given to all parties specified in the DIP Orders.

ii.  All Obligations (x) and all other obligations of the Obligors under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having the priority set forth in the DIP Orders and (y) are secured by a Lien on all assets of the Obligors  (now existing or hereafter acquired) and all proceeds thereof and such Lien has the priority set forth in the DIP Orders.

iii.  The Interim Order and Final Order (on and after the Final Funding Date), as applicable, and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Lender.

iv.  The Approved Budget was prepared in good faith by the management of the Obligors, based on assumptions believed by the management of the Obligors to be reasonable at the time made and upon information believed by the management of the Obligors to have been

accurate based upon the information available to the management of Obligor at the time such Approved Budget was furnished.

    d)  *Purpose of Loans; Cash Collateral*. No portion of any Cash Collateral or proceeds of the Loans shall be used in any manner that is not permitted by the DIP Orders and expressly provided for or included in the Approved Budget (including any Permitted Variance).

9.    <u>Covenants</u>. Each Obligor hereby covenants and agrees as follows:

    a)  *Indebtedness*. The Obligors shall not create, incur, assume or permit to exist any Indebtedness, except Indebtedness created hereunder, Indebtedness of any Obligor to any other Obligor, Indebtedness existing in respect of the Prepetition Note Obligations, Indebtedness existing on the Petition Date, Indebtedness incurred in the ordinary course of business, and other unsecured Indebtedness in an aggregate principal amount not exceeding $50,000 at any time outstanding;

    b)  *Liens*. The Obligors shall not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except Permitted Liens;

    c)  *Fundamental Changes*. Other than through the 363 Sale process, the Obligors shall not merge into or consolidate with any other Person (other than an Obligor) or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) any assets except in the ordinary course of business, or any stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve.

    d)  *Investments, Loans, Advances, Guarantees and Acquisitions*. The Obligors shall not purchase, hold or acquire (including pursuant to any merger with any Person that was not an Obligor prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments and investments by the Obligors existing on the date hereof in the capital stock of their respective Subsidiaries.

    e)  *Restricted Payments.* The Obligors shall not declare or mark, or agree to pay or make, directly or indirectly, any Restricted Payment, except Restricted Payments expressly identified and provided for in the Approved Budget (including any Permitted Variances).

    f)  *Transactions with Affiliates.* The Obligor shall not sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its affiliates, except transactions expressly identified and provided for in the Approved Budget (including any Permitted Variance).

    g)  *Use of Proceeds/Collateral.* No portion of any Cash Collateral or proceeds of the Loans shall be used in any manner that is not permitted by the DIP Orders and expressly provided for or included in the Approved Budget (including any Permitted Variance).

    h)  *Milestones.* The Obligors shall ensure that the following actions are completed on a timely basis:

i. no later than two (2) days after the Petition Date, Debtors shall file a motion in form and substance satisfactory to the DIP Lender seeking approval of bid procedures for a sale pursuant to section 363 of the Bankruptcy Code of the Acquired Assets (the "<u>Bidding Procedures</u>") with the ability of the DIP Lender (or an affiliate thereof) to credit bid up to the full amount of its claims (whether arising under this Note or the Prepetition Credit Agreements and which credit bid may provide for the assignment of the right to purchase the Acquired Assets to a newly formed acquisition vehicle) (the "<u>363 Sale</u>");

ii. no later than three (3) days after the Petition Date, the Bankruptcy Court shall enter the Interim Order, in form and substance satisfactory to the DIP Lender and Stalking Horse Purchaser;

iii. no later than ten (10) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures in a form satisfactory to the DIP Lender and Stalking Horse Purchaser;

iv. no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall enter the Final Order, in form and substance satisfactory to the DIP Lender and Stalking Horse Purchaser;

v. no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the 363 Sale (such date, the "<u>363 Sale Effective Date</u>");

i) *Cash Management*. The Borrower shall at all times maintain cash management systems acceptable to the DIP Lender and in accordance with the Chapter 11 Orders.

j) *Variance Report*. The Borrower shall deliver to the DIP Lender by 4:00 p.m. (prevailing Eastern Time) on the fourth Business Day of each calendar week (provided that the reconciliations set forth in (2) below shall be delivered beginning on the fourth business day after completion of the first two calendar weeks after the Petition Date), each in a form and substance reasonably satisfactory to the DIP Lender (1) then current cash balance calculations as of the immediately preceding Friday, and (2) cash flow reconciliations showing actual payments versus Budget items for prior periods ended; *provided, that* the Debtors may, in their discretion, request that the DIP Lender approves an update, amendment or modification of the Budget and, such update, amendment or modification shall become effective as the "Approved Budget" upon the DIP Lender's consent in writing thereto, in its sole discretion. Subject to Permitted Variances, the Debtors' actual total cash disbursements (excluding fees and expenses of third-party professionals engaged by or for the benefit of the Debtors or the DIP Lender) and gross receipts shall be adhered to, each on a cumulative basis, for the Budget period then ending.

k) *Chapter 11 Filings*. The Borrower shall furnish to the DIP Lender and their respective counsel draft copies of all substantive motions, applications, affidavits, declarations, proposed orders or other documents the Debtors intend to file with the Bankruptcy Court at least three (3) Business Days prior to the date when the Debtors intend to file or execute such documents; *provided, that* the Debtors shall not be required to provide draft retention applications.

l) *Chapter 11 Orders*. The Debtors shall comply with each Chapter 11 Order

m) *Further Assurances*. Each Obligor shall promptly from time to time, give, execute, deliver, file, record, authorize, obtain or endorse any and all financing statements, continuation

statements, notices, instruments, documents, assignments, security agreements, consents and other agreements and writings as may be necessary, desirable or that the DIP Lender may at any time reasonably request in order to create, preserve, secure, protect, perfect, maintain perfection, enforce or validate the security interest granted pursuant hereto or to enable DIP Lender to exercise and enforce its rights hereunder with respect to such security interest.

10.    <u>Security and Administrative Priority</u>.

    a)    *Collateral; Grant of Lien and Security Interest.*

        i.    As security for the full and timely payment and performance of all of the Obligations, upon authorization of the Bankruptcy Court under any of the DIP Orders, each of the Obligors hereby assigns, pledges and grants to DIP Lender a superpriority security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Obligors, and all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money, supporting obligations, guarantees, general intangibles, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds of all Avoidance Actions (subject to entry of a Final Order), rights under section 506(c) of the Bankruptcy Code (subject to the entry of a Final Order), all Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of Obligors subject to the security interest referred to in this Section (10)(a)(i) being hereinafter, collectively, referred to as the "<u>Collateral</u>"). Unless otherwise specified, terms used in this Section 10(a)(i) that are defined in the UCC shall have the meanings set forth therein.

        ii.    The security interests and Liens in favor of the DIP Lender in the Collateral shall be effective immediately upon the entry of the Interim Order and have the priority set forth in the DIP Orders. Such Liens and security interests shall and their priority shall remain in effect until the Commitment shall have been terminated and all Obligations shall have been paid in full.

        iii.    Notwithstanding anything to the contrary, no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral.

        iv.    Subject only to prior payment of Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against any Obligor in respect of any Obligation.

    b)    *Administrative Priority.* Each Obligor agrees that its Obligation shall constitute allowed superpriority administrative expenses in the Chapter 11 Cases, having priority set forth in the DIP Orders, and each Obligor waives all rights, claims and causes of action arising under any provision of the

Bankruptcy Code or otherwise seeking to surcharge the Collateral with respect to the DIP Lender or Prepetition Collateral with respect to the Prepetition Lender, or assert damages or obtain a judgment against the DIP Lender for any costs of the administration of the Chapter 11 Cases.

c) *Grants, Rights and Remedies*. This Note, the DIP Orders and any other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the DIP Lender hereunder and thereunder are cumulative.

d) *Survival*. The Liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this Note, the DIP Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Obligors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

i. except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the DIP Lender against the Obligors in respect of any Obligation;

ii. the Liens in favor of the DIP Lender set forth in clause (a)(i) of this Section shall constitute valid and perfected Liens and security interests having the priority set forth in the DIP Orders, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

iii. the Liens in favor of the DIP Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the DIP Lender file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

11. <u>Events of Default and Acceleration</u>. Each of the following acts, events or circumstances shall constitute an Event of Default (each an "<u>Event of Default</u>") hereunder:

a) the Borrower shall fail (i) to pay any principal or any portion thereof when due, (ii) to pay any interest or any portion thereof or any other amount hereunder or under any other Loan Document (excluding amounts required to be paid pursuant to Section 14(a)) within two (2) Business Days after expiration of the objection period or (iii) to pay any amounts required to be paid pursuant to Section 12(a) for ten (10) Business Days after DIP Lender has requested Borrower to pay the same; or

b) any Obligor shall fail to perform or observe any term, covenant or agreement to be performed or observed by it pursuant to Section 9; or

c) any Obligor shall fail to perform or observe any other covenant or agreement to be performed or observed by it contained herein or in any other Loan Document for ten (10) days after notice thereof; or

d)   Obligors shall fail to pay the expenses of the DIP Lenders as set forth in Section 14(a), which failure to pay shall continue constitute an Event of Default on the seventh (7th) Business Day after delivery of the applicable invoice; or

e)   any Budget Event occurs; or

f)   any representation or warranty of any Obligor made herein or in any other Loan Document proves to have been materially incorrect when made or reaffirmed; or

g)   any fraudulent act, fraudulent conduct or fraudulent omission by the Obligors with respect to the Loan Documents or the Chapter 11 Orders; or

h)   a Change of Control shall occur; or

i)   Obligors shall use Cash Collateral or Collateral in any manner not authorized by the DIP Orders and the Loan Documents; or

j)   any monetary non-monetary judgment shall be rendered against any of the Obligors after the date hereof which causes or would reasonably be expected to cause a Material Adverse Effect; or

k)   any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations (other than contingent obligations not due and payable as of such date) ceases to be in full force and effect or any Obligor shall contest the validity or enforceability of any part of this Note or any other Loan Document; or

l)   any of the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any of the Chapter 11 Cases (in either case, unless such dismissal does not provide for termination of the use of the Collateral and require and result in the payment in full in cash of the Obligations)), or converted to a case under chapter 7 of the Bankruptcy Code, or any Obligor shall file any pleading requesting any such relief; or a motion shall be filed by any Obligor for the approval of, or there shall arise, any other Claim having priority senior to or *pari passu* with the claims of the DIP Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out); or

m)   any Obligor files a motion in the Chapter 11 Cases to (i) obtain additional or replacement financing from a party other than DIP Lender under section 364(d) of the Bankruptcy Code or (ii) to use Collateral under section 363(c) of the Bankruptcy Code other than any application related to the DIP Order, except (i) (x) with the express written consent of the DIP Lender or (y) to the extent any such financing shall provide for the payment in full of the Obligations and (ii) to the extent such financing is secured by Prepetition Collateral, (x) with the express written consent of the Prepeition Lender or (y) to the extent any such financing shall provide for the payment in full of the Prepetition Obligations; or

n)   any Obligor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition Claim (or the Obligor shall otherwise make a payment on any prepetition claim) other than (x) as provided for in the Approved Budget (including any Permitted Variance) or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate or to permit

other actions that would have a material adverse effect on such Obligor or its estate or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Approved Budget (including any Permitted Variance) with any secured creditor of any Obligor providing for payments as adequate protection or otherwise to such secured creditor (in each case, other than Permitted Adequate Protection Payments or as provided in the DIP Orders); or

o)  (i) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority (as set forth in this Note) of any of the Obligations or the liens securing the Obligations (or any invalidation or impairment of such liens and/or superpriority claims of the DIP Lender shall otherwise occur), (ii) subject to entry of the Final Order, any imposition, surcharge or assessment against the DIP Lender's interest in the Collateral, or the Prepetition Lender's interest in the Prepetition Collateral (subject to entry of the Final Order), whether pursuant to sections 506(c) or 552 of the Bankruptcy Code or (iii) any material provision of any Loan Document shall cease to be effective; or

p)  any Chapter 11 Order (i) shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Obligor shall apply for authority to do so) without the written consent of the DIP Lender and Prepetition Lender, which consent may be withheld in their respective sole discretion (or any Obligor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph), or (ii) shall cease to be in full force and effect; or

q)  any of the Obligors shall (i) fail to comply with the terms and conditions of any Chapter 11 Order (other than a non-monetary breach with respect to adequate protection set forth therein) or (ii) breach any non-monetary provisions with respect to the adequate protection provisions set forth in the DIP Orders and such breach shall remain uncured for five (5) Business Days after the Borrower's receipt of written notice thereof; or

r)  the Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code) under clause (b) of section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Obligor shall file, or otherwise support, any pleading seeking such appointment or acquiesce in or fail to object to, any such appointment), in each case without the written consent of the DIP Lender and the Prepetition Lender (which consent may be withheld in their respective sole discretion); or

s)  entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; or

t)  the Obligors or any of their affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Obligors or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim; or

u)  (i) The Obligors or any of their affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the Loan Documents or (ii) entry of an order of the Bankruptcy Court with respect to any

pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the DIP Lender under the Loan Documents; or

> v) Any judgments or orders (not covered by insurance) which are in the aggregate in excess of $50,000.00 as to any postpetition obligation shall be rendered against any of the Obligors after the date hereof and the enforcement thereof shall not be stayed, vacated or discharged; or there shall be rendered against any of the Obligors a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Obligors to perform their obligations under the Loan Documents or the value of the Collateral; or

> w) entry of an order by the Bankruptcy Court with respect to any pleading or proceeding brought by any Person which results in such a material impairment of the rights or interests of the DIP Lender under the Loan Documents; or

> x) a sale order shall be entered or a plan confirmed in the Chapter 11 Cases which does not provide for payment in full in cash of the Obligations on the closing date thereof; or

> y) the initiation by the Obligors, any statutory committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding with respect to any provision of this Note, the Obligations of the DIP Lender, including, but not limited to, any actions pursuant to Chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the DIP Orders.

Upon the occurrence of an Event of Default described above, the principal of and accrued interest on this Note then outstanding shall become immediately due and payable without any declaration or other act on the part of Lender. As used herein, the term "<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

12.    <u>Remedies; Cumulative Rights</u>.  Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may, upon three (3) Business Days' written notice as set forth below, declare the principal amount of this Note together with any interest thereon to be due and payable, and the principal amount of this Note together with any such interest shall thereupon immediately become due and payable without presentment, further notice, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower, at which point the automatic stay of section 362 of the Bankruptcy Code shall be modified without order of the Bankruptcy Court, without need for filing any motion for relief from the automatic stay or any other any other pleading, for purposes of permitting the DIP Lender to exercise any or all of its rights and remedies set forth in the DIP Orders or the Loan Documents, including, without limitation: (a) directing the DIP Lender to foreclose on the Collateral and (b) declaring a termination, reduction or restriction on the ability of the Obligors to use Loan proceeds and cash collateral derived from proceeds of Collateral. In addition, upon the occurrence of an Event of Default, the DIP Lender may file a motion to seek to terminate or modify the Obligors' plan exclusivity periods under section 1121(d) of the Bankruptcy Code and have such motion heard on shortened notice (but in no event on less than three (3) Business Days' notice). Without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, upon three (3) Business Days' prior written notice as set forth below, the DIP Lender may protect and enforce its rights under this Note and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Note or any other Loan Document, and the DIP Lender may enforce payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under

this Note, any other Loan Document, or under applicable law or in equity. Notwithstanding the foregoing, any exercise of remedies is subject to the requirement of the giving of three (3) Business Days' prior written notice to counsel for the Obligors, the Office of the United States Trustee and counsel for the Official Committee (if any). For the avoidance of doubt, the waivers in this paragraph shall not apply to any opposition as to the existence of an Event of Default.

13.     <u>Waivers</u>.  Except for the notices expressly required by the terms of this Note (which rights to notice are not waived by Borrower), Borrower, for itself and its successors and assigns, hereby forever waives presentment, protest and demand, notice of protest, demand, dishonor and non-payment of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, and waives and renounces (to the extent allowed by law) all rights to the benefits of any statute of limitations and any moratorium, appraisement, and exemption now allowed or which may hereby be provided by any federal or state statute or decisions against the enforcement and collection of the obligations evidenced by this Note and any and all amendments, substitutions, extensions, renewals, increases, and modifications hereof.  Borrower expressly agrees that this Note may be extended or subordinated, by forbearance or otherwise, from time to time, without in any way affecting the liability of Borrower.  No consent or waiver by Lender with respect to any action or failure to act, which without such consent or waiver would constitute a breach of any provision of this Note, shall be valid or binding unless in writing signed by Lender and then only to the extent expressly specified therein.  Neither the failure nor any delay in exercising any right, power or privilege under this Note, at law or equity, or otherwise available agreement, will operate as a waiver of such right, power or privilege and no single or partial exercise of any such right, power or privilege by Lender will preclude any other or further exercise of such right, power or privilege.

14.     <u>Expenses, Amendments, Indemnity, Notices</u>.

a)     *Expenses*.  The Borrower shall promptly pay on demand all costs and expenses of the DIP Lender whether incurred prior to, on, or after the Petition Date (i) in connection with the negotiation, preparation, administration, execution, implementation or consummation of the Stalking Horse Purchase Agreement, including the administration, interpretation of and enforcement of remedies thereunder; (ii) in connection with the 363 Sale; (iii) in connection with the negotiation, preparation, administration, execution, implementation or consummation of the Loan Documents and any other agreement in connection therewith (other than any document regarding the purchase of any assets of the Obligors by DIP Lender, which expenses shall be separately addressed), including filing fees, taxes, assessments, attorney's fees and expenses and the allocated cost of any internal counsel to the DIP Lender; and (iv) in connection with each amendment, forbearance, waiver, consent, refinancing, restructuring, reorganization (including any fees (including attorneys' fees) and costs incurred by the DIP Lender, in its capacity as such, for any reason in respect of the bankruptcy of the Borrower), enforcement or attempted enforcement, and any matter related thereto, and in each case including all out of pocket expenses of the DIP Lender or DIP Lender's attorneys that are related thereto; (iii . The Borrower shall pay on demand all reasonable fees and costs of consultants, appraisers, accountants and the like engaged by the DIP Lender in respect of the Borrower's obligations hereunder. Notwithstanding the foregoing, the DIP Lender shall concurrently provide copies of any invoices with respect to the costs and expenses specified in this Section 14(a) to counsel to the Debtors and any statutory committee appointed in these Chapter 11 Cases and allow such counsel up to five (5) Business Days to review and object to any fees and expenses requested therein and if any objection is asserted, the Obligors shall promptly pay the undisputed portion of such fees and expenses and the Bankruptcy Court shall decide the issue as to any unresolved dispute related to fees and expenses. Upon resolution by the Bankruptcy Court of such disputed fees and expenses, the Obligors shall promptly cause the same to be paid to the DIP Lender.

b) *Amendments*. This Note may not be changed, modified or terminated orally, but only by an agreement in writing signed by the Obligors and the DIP Lender.

c) *Indemnity*. The Obligors agree, jointly and severally, to indemnify the DIP Lender and each of their Related Parties (each such Person being called an "<u>Indemnitee</u>") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented out-of-pocket counsel and consultant or other expert fees, charges and disbursements incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, performance or delivery of the Loan Documents or Prepetition Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations hereunder or thereunder, the Chapter 11 Cases, the borrowings hereunder and the other transactions contemplated by the Loan Documents and the Prepetition Loan Documents, (ii) the use or proposed use of the proceeds of the Loans or the loans under the Prepetition Loan Documents or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have arisen from the gross negligence, bad faith or willful misconduct of such Indemnitee or of its Related Parties

d) *Notices.* Any notices required or permitted to be given under the terms of this Note shall be sent or delivered personally or by courier (including a recognized, receipted overnight delivery service) and shall be effective upon receipt, if delivered personally or by courier (including a recognized overnight delivery service), in each case addressed to Obligors or DIP Lender.  The addresses for such communications shall be:

If to Obligors:

> RUDY'S BARBERSHOP HOLDINGS LLC
> 1605 Boylston Ave, Ste 202
> Seattle, WA 98122
> Attn: Katie Trent; Ryan Kyle

If to DIP Lender:

> RBS SALON HOLDINGS, INC.
> c/o DLA Piper LLP (US)
> 51 John F. Kennedy Parkway, Suite 120
> Short Hills, NJ 07078
> Attn: Kevin Grant, Esq.

Obligors or DIP Lender shall provide notice to the other of any change in its address.

15. <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, the DIP Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits at any time held and other obligations at any time owing by the DIP Lender to or for the credit or the account of any Obligor against any and all of the obligations of such Obligor now or hereafter existing hereunder to the DIP Lender or, irrespective of whether or not the DIP Lender shall have made any demand hereunder and although such obligations of the Borrower may be

contingent or unmatured or are owed to a branch or office of the DIP Lender different from the branch or office holding such deposit or obligated on such indebtedness.

16.     <u>Assignment</u>. Obligors may not transfer, assign or delegate any of their rights or obligations hereunder without the prior written consent of DIP Lender.  DIP Lender may transfer, assign or delegate any of its rights or obligations hereunder without the prior written consent of Borrower and, as used herein, the term "DIP Lender" shall mean and include such successors and assigns.  This Note shall accrue to the benefit of DIP Lender and its permitted successors and assigns and shall be binding upon the Obligors and their successors and assigns.

17.     <u>Amendment</u>. The provisions of this Note may be amended only by a written instrument signed by Borrower and Lender.

18.     <u>Governing Law</u>. THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF ALL PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE.

19.     <u>Jurisdiction; Waiver of Jury Trial</u>. ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT SHALL BE FILED, TRIED AND LITIGATED IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS NOTE, EACH OBLIGOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT AND IRREVOCABLY WAIVES ANY OBJECTION IN RESPECT THEREOF. EACH OBLIGOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES HEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPARE, TO THE OBLIGORS AT THEIR ADDRESS FOR NOTICES SET FORTH HEREIN. EACH OBLIGOR HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE, INCLUDING CONTRACT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH OF DIP LENDER AND OBLIGORS HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES THE AFORESAID TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS NOTE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

20.     <u>Conditions Precedent to Interim Funding</u>. The obligation of the DIP Lender to lend the Interim Loan to the Borrower is subject to the satisfaction (or waiver by the DIP Lender) of the following conditions (the date on which such conditions are satisfied being referred to herein as the "<u>Closing Date</u>"):

        a)   *Loan Documents*. The DIP Lender shall have received this Note executed and delivered by each of the Obligors.

        b)   *UCC Searches*. The DIP Lender shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to each Obligor in its state of formation.

        c)   *Representations and Warranties*. The representations and warranties contained in this Note and each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all

respects) on and as of the Closing Date (or in the case of the funding of the Final Loans on the Final Funding Date referred to below, as of such date).

      d)    *Fees and Expenses*. The DIP Lender shall have received all fees and expenses due and payable to DIP Lender on or prior to the Closing Date, including, to the extent invoiced, the reimbursement or payment of all reasonable and documented expenses (including reasonable and documented fees, charges and disbursements of counsel and other advisors subject to the provisions of the DIP Orders).

      e)    *Defaults*. There shall be no default or Events of Default under the Loan Documents before and after giving effect to the relevant borrowing.

      f)    *Material Adverse Effect*. Since the Petition Date no event or circumstances or change shall have occurred that has or could be reasonably expected to have a Material Adverse Effect.

      g)    *Budget*. The DIP Lender shall have received the Initial Budget, which shall be in form and substance acceptable to the DIP Lender in its sole discretion, and such other information (financial or otherwise) as the DIP Lender may reasonably request.

      h)    *Collateral*. The DIP Lender shall have been granted a perfected lien on the Collateral by the Interim Order on all terms and conditions set forth in this Note.

      i)    *Litigation*. Except for claims, actions, suits, investigations, litigation or proceedings stayed by § 362 of the Bankruptcy Code, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the DIP Lender, singly or in the aggregate, could have a Material Adverse Effect and there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the DIP Lender, which relates to the Loans or the transactions contemplated by the Loan Documents.

      j)    *Bankruptcy Related Conditions*.

          i.    The Chapter 11 Cases shall have been commenced in the Bankruptcy Court by April 2, 2020 and all of the "first day motions" and all related pleadings filed at the same time of the commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance satisfactory to the DIP Lender.

          ii.    The Interim Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) no later than five (5) days after the Petition Date, the DIP Lender shall have received a true and complete copy of such order and such order shall be in form and substance satisfactory to the DIP Lender in all respects, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.

          iii.    All orders, including without limitation orders pertaining to adequate protection, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender in its sole discretion, be in full force and effect, and shall not (in whole or in part) have

been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.

    iv.     The Obligors shall be in compliance with each Chapter 11 Order.

    v.     No appeal of the DIP Orders shall have been filed or remain pending.

21.   <u>Conditions Precedent to Final Funding</u>. The obligation of the DIP Lender to lend the Final Loans to the Borrower is subject to the satisfaction of the conditions set forth in Section 20 (as of the Final Funding Date) and the following (the date on which such conditions are satisfied being referred to herein as the "<u>Final Funding Date</u>"):

    a)   *Approved Budget.* The DIP Lender shall have received all periodic updates required hereunder with respect of the Approved Budget, each in form and substance satisfactory to the DIP Lender in its sole discretion, and the Obligors shall be in compliance with the Approved Budget.

    b)   *Final Order.* The Final Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) not later than twenty-five (25) days after the Petition Date, and such Final Order shall (i) have included waivers of (x) the automatic stay in connection with the DIP Lender's enforcement of remedies upon an Event of Default, (y) any surcharge of costs or expenses with respect to the DIP Lender's interest in the Collateral under sections 506(c) and 552 of the Bankruptcy Code or any other statute or applicable law permitting a surcharge of the Collateral, and (z) the equitable doctrine of marshaling, and otherwise be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated (in whole or in part) absent prior written consent of the DIP Lender and (ii) grant a perfected lien on the Collateral in favor of the DIP Lender on the terms and conditions set forth in this Note.

22.   <u>Credit Bid</u>. Each Obligor hereby irrevocably authorizes the DIP Lender (or its designees), to bid and purchase by credit bidding its claims or otherwise (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted (i) under the provisions of the UCC, including pursuant to sections 9-610 or 9-620 of the UCC, (ii) under the provisions of the Bankruptcy Code, including sections 363, 365 and 1129 of the Bankruptcy Code or (iii) in accordance with Applicable Law (any such sale described clauses (i), (ii) or (iii), a "<u>Collateral Sale</u>"), and in connection with any Collateral Sale.

23.   <u>Term Generally; Defined Terms</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Note and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, supplemented or otherwise modified from time to time. The rules of construction set forth in this Section 18 shall be applicable to the Loan Documents mutatis mutandis. For purposes of this Note, the following terms shall have the following definitions:

"Approved Budget" means each of (a) the Initial Budget and (b) any subsequent Budget delivered by the Borrower and approved in writing by the DIP Lender and Prepetition Lender in their respective sole discretion.

"<u>Avoidance Actions</u>" means all causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), 732(2) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"<u>Budget Event</u>" means (a) the actual amount of aggregate cumulative operating disbursements and expenses (excluding professional fees and expenses) during any Budget Testing Period shall exceed the projected operating disbursements (on a cumulative basis) in the Approved Budget for such Budget Testing Period by more than 10% or (b) the aggregate amount of actual receipts during any Budget Testing Period shall be less than 90% of the aggregate cumulative receipts in the Approved Budget for such Budget Testing Period (the variances described in (a) and (b), the "<u>Permitted Variance</u>", and such Permitted Variance subject to receipt by DIP Lender of the Variance Report).

"<u>Budget Testing Date</u>" means the fourth Business Day of each calendar week.

"<u>Budget Testing Period</u>" means, with respect to the initial Budget Testing Date, the period beginning on the Petition Date and ending on the following Friday immediately preceding the initial Budget Testing Date and for each Budget Testing Date thereafter, the one-week period ending on the Friday immediately preceding the Budget Testing Date.

"<u>Business Day</u>" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of New York.

"<u>Cash Collateral</u>" has the meaning assigned to such term in the DIP Orders.

"<u>Carve-Out</u>" has the meaning assigned to such term in the DIP Orders

"<u>Chapter 11 Case</u>" means the chapter 11 cases commenced by the Debtors pending before the United States Bankruptcy Court for the District of Delaware as Case Nos. [•].

"<u>Chapter 11 Orders</u>" means any, each and all of the orders entered by the Bankruptcy Court in respect of the Chapter 11 Cases.

"<u>Commitment</u>" means the commitment of the DIP Lender to make Loans hereunder *plus* (ii) for purposes of computing the Commitment Fee and Exit Fee, $250,000.00.

"**<u>DIP Orders</u>**" means, collectively, the Interim Order and the Final Order.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"<u>Final Order</u>" means the final order of the Bankruptcy Court with respect to the Obligors, among other things, approving the Note and the other Loan Documents and granting adequate protection, in form and substance satisfactory to the DIP Lender in all respects, as the same may be amended, modified or supplemented from time to time with the express written consent of the DIP Lender.

"<u>Indebtedness</u>" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"<u>Initial Budget</u>" shall mean the Budget prepared by the Borrower and furnished to and approved in writing by the DIP Lender and the Prepetition Lender in the form of <u>Exhibit A</u> hereto.

"<u>Interim Order</u>" means the interim order of the Bankruptcy Court with respect to the Obligors, among other things approving the Note and the other Loan Documents and granting the DIP Lender adequate protection, in form and substance satisfactory to the DIP Lender in all respects, as the same may be amended, modified or supplemented from time to time with the written consent of the DIP Lender.

"<u>Lien</u>" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"<u>Loan Documents</u>" means this Note, the Budget, any other documents, instruments or agreements entered into or made by the DIP Lender and/or the Borrower in connection with the foregoing, together with the DIP Orders.

"<u>Material Adverse Effect</u>" means a material adverse effect on and/or material adverse developments (except for the commencement of the Chapter 11 Cases and the effects that customarily result therefrom) with respect to (i) the business, operations, properties, assets or condition (financial or otherwise) of the Obligors, (ii) the ability of any Obligor to fully and timely perform its Obligations, (iii) the legality, validity, binding effect or enforceability against an Obligor of any Loan Document or (iv) the rights, remedies and benefits available to, or conferred upon, the DIP Lender under this Note or any other Loan Document.

"<u>Maturity Date</u>" means unless extended by the DIP Lender in its sole and absolute discretion, the earliest to occur of (i) May 15, 2020; (ii) the date that is twenty-five (25) days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date;

(iii) the effective date of any plan of reorganization or plan of liquidation of the Obligors confirmed by the Bankruptcy Court; (iv) the earlier of (x) the 363 Sale Effective Date or (y) consummation of a sale of substantially all of the Debtors' assets; (v) the date the Bankruptcy Court (x) orders the conversion of the bankruptcy case of any Obligor to a case under Chapter 7 of the Bankruptcy Code or (y) dismisses the Chapter 11 Cases with respect to any Obligor; and (vi) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Note

"Obligations" means, collectively, (a) in the case of the Borrower, all obligations of the Borrower under this Note and the other Loan Documents to pay principal, fees, interest (including default interest), expenses and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing by the Borrower to the DIP Lender, and (b) in the case of the Guarantors, all obligations of the Guarantors in respect of its guarantee under Section 5 and all other obligations of the Guarantors under this Note or any other Loan Document and (c) in the case of each of the foregoing, including all interest thereon and expenses related thereto.

"Permitted Liens" means, with respect to any person: (a) Liens arising by operation of law which were incurred in the ordinary course of business and which do not in the aggregate materially detract from the value of the property subject thereto or materially impair the use thereof in the operations of the business of such person; (b) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation; (c) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by generally accepted accounting principles shall have been made; (d) Liens in respect of the Prepetition Obligations; (e) Liens existing on the Petition Date; and (f) Liens granted pursuant to the DIP Orders.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"Prepetition Note" means that certain Senior Secured Multi-Draw Term Promissory Note dated as of March 24, 2020 by and between Rudy's Barbershop Holdings LLC and RBS Salon Holdings, Inc.

"Prepetition Note Obligations" means "Obligations" as defined in the Prepetition Note, the sum of which as of the Closing Date is $237,295.93.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective equityholders, managers, investors, fiduciaries, trustees, officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns of such Person and such Person's affiliates.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any of the Obligors or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar

19

deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"<u>Stalking Horse Purchaser</u>" means RBS Salon Holdings, Inc.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York is applicable, the term UCC shall mean the Uniform Commercial Code as in effect in such other jurisdiction.

"<u>United States Trustee</u>" means the Office of the United States Trustee for the District of Delaware

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

EXECUTED AND DELIVERED as of the first date written above.

**BORROWER:**

RUDY'S BARBERSHOP HOLDINGS, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

**GUARANTORS:**

RUDY'S BARBER SHOP, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

RUDY'S PORTLAND, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

RUDY'S SOUTHEAST, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

RUDY'S HOLLYWOOD, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

RUDY'S NEW YORK, LLC

By: ___/s/ Kathleen Trent_____
Name: Kathleen Trent
Title: Chief Executive Officer

EXECUTED AND DELIVERED as of the first date written above.

**DIP LENDER:**

RBS SALON HOLDINGS, INC.

By: _____

Name: Benjamin Mahdavi

Title: President